[Crim. No. 4433. First Dist., Div. One. Apr. 21, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. QUINCY LEON FORK, Defendant and Appellant.

Quincy Leon Fork, in pro. per., and Andrew P. Smirnoff, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Edwin P. O'Brien and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, J.—Defendant appeals from the judgment of conviction after a jury verdict finding him guilty of forgery (in violation of Pen. Code, § 470).[1] The jury also found to be true the allegation in the information as to a prior felony conviction, defendant having denied this allegation.

### Questions Presented

1. Was the evidence sufficient to sustain the conviction?

2. Did the trial court err in ruling that defendant's prior conviction was a felony rather than a misdemeanor, thus allowing the jury to consider it?

---

[1] Defendant has also appealed from the order denying his motion for a new trial. Such an order is not appealable where an appeal is taken from a final judgment of conviction. However, upon appeal from the final judgment, the court may review an order denying a motion for a new trial. (Pen. Code, § 1237; *People* v. *King*, 60 Cal.2d 308, 309 [32 Cal.Rptr. 825, 384 P.2d 153]; *People* v. *Britton*, 205 Cal.App.2d 561, 562 [22 Cal.Rptr. 921].)

3. Was the testimony of the police officers as to certain statements which defendant made to them at the time of his arrest improperly admitted into evidence in light of the rule announced in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361] ?

### The Record

On the afternoon of April 30, 1963, defendant entered the Fillmore Cigar Store located at 1701 Fillmore Street in San Francisco. This store displayed a sign in its window advertising that payroll checks could be cashed therein. Upon entering the store, defendant approached the clerk and handed him a check which was imprinted with the name of the Ensign Cafe, No. 1 Market Street. The check, which was dated April 29, 1963, was drawn on the North Beach Branch of the Bank of America for $71.62, and was made payable to the order of Tommy Carpenter. In addition to the check, defendant gave the clerk an Indiana driver's license, dated April 30, 1956, issued to a Tommy Carpenter, of 4151 Graceland Avenue, Indianapolis, Indiana, and a temporary California driver's license in the name of Tommy Carpenter, dated July 18, 1961. As he handed these three documents to the clerk defendant inquired of him ''could this check be cashed?'' The clerk in turn showed the check and the two driver's licenses to the store manager, Miss Pins, who did not know defendant's name, but recognized him as having been in the store on other occasions in the past. Miss Pins asked defendant '' 'is this your check?' '' and '' 'do you work there?' '' Defendant answered, '' 'yes,' '' whereupon Miss Pins asked defendant if the restaurant was open at that time, defendant replying that the cafe was '' 'closed already.' ''

Following this conversation, Miss Pins telephoned ''Information'' in an effort to obtain the telephone number of the Ensign Cafe. Upon learning that there was no telephone listing, Miss Pins took the check and the driver's licenses to her uncle, the store owner, who was in the store at the time. The owner then conversed with defendant, questioning him as to his apparent eagerness to regain possession of the check and his hurry to leave the store, defendant having reached over the counter and attempting to pull the check from the owner's hand.

Meanwhile the police arrived, having been sent for by Miss Pins, who showed the officers the check and identification papers and told them of the events which had transpired. One

of the policemen then questioned defendant regarding the check, defendant responding (according to the testimony of the officer) that it was his check, that it was a check for having worked at the Ensign Cafe, and that Tommy Carpenter was his true name. The police then sent for a patrol wagon, and when it arrived the drivers recognized defendant and addressed him as Quincy Fork.

At the trial the Operations Officer at the North Beach Branch of the Bank of America testified that the account of the Ensign Cafe had been closed in 1957, that the check in question was not of the magnetic coding type currently in use, and that neither of the two authorized signatures for the Ensign Cafe account, namely, " 'C' Caldaralla" and " 'M. A.' Caldaralla," appeared on the check in question. Further, Officer Hall, who was one of the officers called to the cigar store on the afternoon of April 30, 1963, testified that he was acquainted with the Ensign Cafe and that it had been closed following the conviction and incarceration of its owner.

### Sufficiency of the Evidence

Defendant's first contention on appeal is that the evidence is insufficient to sustain the conviction. ■ Initially, we note the well-established rule concerning the scope of review of an appellate court that only where there is no substantial evidence in the record to justify the conclusion reached by the trial court can a court of appeal reverse the judgment of conviction on the ground of insufficiency of the evidence. ■ The function of an appellate court, therefore, is limited to ascertaining from the record whether there is any substantial evidence to support the verdict of the jury. (*People* v. *Carr*, 156 Cal.App.2d 462, 464 [319 P.2d 445]; *People* v. *Janisse*, 162 Cal.App.2d 117, 122 [328 P.2d 11].) ■ Our review, moreover, is bound by the rule that insofar as the evidence is subject to opposing inferences, it must upon a review thereof be regarded in the light most favorable to support the judgment. (*Mah See* v. *North American Acc. Ins. Co.*, 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123]; *Hamilton* v. *Pacific Elec. Ry. Co.*, 12 Cal.2d 598, 602-603 [86 P.2d 829].)

According to Penal Code section 470,[2] a person commits a forgery when he, "with intent to defraud, signs the name of another person, or of a fictitious person, knowing that he has no authority so to do, to, or falsely makes, alters, forges,

[2]Unless otherwise indicated, all statutory references are to the Penal Code.

or counterfeits, any . . . check . . .; or utters, publishes, passes, or attempts to pass, as true and genuine, any of the above-named false, altered, forged, or counterfeited matters, . . . knowing the same to be false, altered, forged, or counterfeited, with intent to prejudice, damage, or defraud any person; . . .''

■ Either the forging or the uttering (making use) of the instrument is enough to sustain a conviction. (*People* v. *McKenna*, 11 Cal.2d 327, 332 [79 P.2d 1065]; *People* v. *Ross*, 198 Cal.App.2d 723, 727 [18 Cal.Rptr. 307]; *People* v. *Allen*, 212 Cal.App.2d 857, 860 [28 Cal.Rptr. 409].) ■ Although the information in the instant case charged defendant with both forging and uttering the check in question, and although the record indicates that the instrument was undoubtedly forged by someone, there does not appear to be evidence in the record which links defendant with the actual forgery. Accordingly, defendant's conviction can only be sustained on the basis of an attempt to pass a forged instrument.

Defendant urges that he did not attempt to pass the check. In his testimony at the trial he claimed that he took the check in question as security for a loan which he had previously made to the named payee, Tommy Carpenter, and that his purpose in presenting the check to the clerk in the cigar store was ''To find out if this check was negotiable, whether it was any good.'' He further claims that the testimony of the witness for the prosecution, Miss Pins, corroborated this fact, and that the prosecution failed to establish any attempt by defendant to make use of the check.

■ As against these contentions we have the following evidence which is supportive of the jury's implied finding that defendant intended and was attempting to pass the check in question: Miss Pins testified that she heard defendant ask the clerk whether the check could be cashed; defendant gave an affirmative answer when she asked '' 'is this your check?' '' '' 'do you work there [at the Ensign Cafe]?' ''; when the validity of the check was questioned defendant appeared to be in a hurry to retrieve it and to leave the store. With respect to the latter circumstance, while there is no evidence that defendant attempted to flee the scene, the jury could nevertheless reasonably infer that his acts demonstrated a consciousness of guilt. (See *People* v. *Anderson*, 90 Cal.App.2d 326, 333 [202 P.2d 1044]; *People* v. *Ruiz*, 103 Cal.App.2d 146, 149 [229 P.2d 73].) The record also discloses that after the police arrived, defendant persisted in his false representations that he was Tommy Carpenter, that the check in question was his, and

that it was in payment for working at the Ensign Cafe.

 Although the evidence is sufficient to support a finding that defendant attempted to pass the check in question, in order to constitute the offense of uttering a forgery as that offense is defined in section 470, two other factors must be present: (1) It must be known to the person attempting to pass the check that it is not genuine (*People* v. *Chapman,* 156 Cal.App.2d 151, 156 [319 P.2d 8]; *People* v. *Sinshiemer,* 182 Cal.App.2d 103, 109 [5 Cal.Rptr. 740]), and (2) the uttering must be done with the intent to prejudice, damage, or defraud some person. (*People* v. *Hellman,* 189 Cal.App.2d 777, 778-779 [11 Cal.Rptr. 433]; *People* v. *Martin,* 208 Cal.App.2d 867, 878-879 [25 Cal.Rptr. 610].) It is established that the requisite specific intent can be inferred from a finding that the defendant attempted to pass a check which he knew to be false. (*People* v. *Weiskopf,* 60 Cal.App.2d 214, 217-218 [140 P.2d 201]; *People* v. *Chapman, supra,* p. 158; and see *People* v. *Williams,* 186 Cal.App.2d 420, 424 [8 Cal.Rptr. 871], wherein the facts were almost identical to those in the present case.)

 In the instant case there is sufficient evidence from which it could be inferred that defendant knew the check was not genuine and that he intended to defraud the proprietor of the cigar store. Supportive of this inference is the testimony by both Inspector Hall and Miss Pins that defendant stated he worked at the Ensign Cafe, the drawer of the subject check; the testimony by Miss Pins that defendant told her the cafe was "already closed" when she attempted to locate its telephone number; the testimony of Hall and Patrolman Buckley that the cafe was no longer in business; and the evidence of defendant's attempt to pull the check from the proprietor's hand and defendant's eagerness to leave the store.

## The Prior Conviction

Defendant further contends that the trial court improperly ruled that his prior conviction was that of a felony rather than a misdemeanor. In addition to charging defendant with a violation of section 470, the information in the instant case also alleged a prior felony conviction. At the time of entering his plea, defendant denied this allegation on the basis that his prior conviction had been that of a misdemeanor rather than a felony. Accordingly, the allegation was read to the jury (see § 1093; *People* v. *Williams,* 148 Cal.App.2d 525, 535 [307 P.2d 48], as authority for this procedure), and was found by the

jury to be true. On this appeal defendant reiterates his contention that his prior conviction was that of a misdemeanor only, and that it was therefore error for the trial court to allow the jury to consider this prior conviction for any purpose. (See § 3024, subd. (c), which relates to the effect of a prior *felony* conviction on criminal punishment.)

At the trial defendant stipulated to the following facts respecting his prior conviction: That he was convicted of grand theft in violation of section 487, by the Superior Court of Kern County in 1955 (section 489 provides that grand theft is punishable by imprisonment either in the county jail or in the state prison); that following the entry of judgment, he was sentenced to the Youth Authority; and that subsequently the Youth Authority committed him to San Quentin Prison.

Section 17, which deals with the classification of offenses as either felonies or misdemeanors, read in 1955 as follows: "A felony is a crime which is punishable with death or by imprisonment in the state prison. Every other crime is a misdemeanor. When a crime, punishable by imprisonment in the state prison, is also punishable by fine or imprisonment in a county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes after a judgment other than imprisonment in the state prison, unless the court commits the defendant to the California Youth Authority. Where a court commits a defendant to the California Youth Authority upon conviction of a crime punishable by imprisonment in the state prison or fine or imprisonment in a county jail, in the discretion of the court, the crime shall be deemed a felony until and unless the court, after the person committed has been discharged from control by the California Youth Authority, and only if he was not placed in a state prison by the authority during the period of such control, on application of the person so committed and discharged, makes an order determining that the crime of which he was convicted was a misdemeanor."

In 1959, section 17 was amended to read in part as follows: "Where a court commits a defendant to the Youth Authority upon conviction of a crime punishable, in the discretion of the court, by imprisonment in the state prison or fine or imprisonment in a county jail, the crime shall be deemed a misdemeanor." Defendant argued at the trial, and continues to urge on appeal, that the 1959 amendment should be given retroactive effect so as to apply to his 1955 conviction. The trial court rejected this contention, ruled that the 1955 version

of section 17 was applicable in determining the characterization of defendant's prior conviction, and that, accordingly, the prior conviction was a felony.

It is a well-established rule that the characterization of a former offense as a felony or misdemeanor is to be determined according to the law at the date of conviction. (*People* v. *McConnell,* 20 Cal.App.2d 196, 197 [66 P.2d 720]; *In re Harincar,* 29 Cal.2d 403, 406-407 [176 P.2d 58].) As to whether a change in the law made subsequent to the date of conviction can be considered in determining the nature of the offense, it is a general rule of construction, applicable to codes and other statutes alike, that, unless the intention to make it retrospective clearly appears from the act itself, a statute will not be construed to have that effect. (§ 3; *In re Fisher,* 1 Cal. App.2d 449, 450-451 [36 P.2d 841]; *People* v. *Armstrong,* 100 Cal.App.2d Supp. 852, 856 [224 P.2d 490].) Accordingly, since section 17 contains no language indicating that the Legislature intended retrospective effect to be given to the 1959 amendment, the nature of defendant's prior conviction must be determined according to the section as it read in 1955. Several cases have specifically so held. (See *People* v. *Ramsey,* 202 Cal.App.2d 856, 859 [21 Cal.Rptr. 406]; *People* v. *Zaccaria,* 216 Cal.App.2d 787, 789 [31 Cal.Rptr. 383].) The trial court therefore correctly ruled that defendant's prior conviction was a felony pursuant to the provisions of section 17 as it read in 1955.

## The Dorado Rule

The final issue which we are called upon to resolve in connection with this appeal concerns the applicability of the California Supreme Court's decision in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], to the instant case. *Dorado* held that it was error for a trial court to admit into evidence the confession of an accused which was elicited under the following circumstances: (1) The investigation was no longer a general inquiry into an unsolved crime but had begun to focus on the defendant; (2) the defendant was in custody; (3) the authorities had carried out a process of interrogation that lent itself to eliciting incriminating statements; and (4) the authorities had not effectively informed the defendant of his right to counsel or of his absolute right to remain silent, and no evidence established that he had waived these rights. In enunciating this rule, *Dorado* follows the principles declared in the recent United States Supreme Court de-

cisions of *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246] and *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].

Although *Dorado* specifically concerned a confession by the defendant, there is a strong intimation in the decision that the rule also applies to admissions, although in the latter situation the introduction into evidence of the statements may constitute harmless error. It should be noted, moreover, that it is established in California that the same reasons for excluding involuntary confessions apply to involuntary admissions as well. (*People* v. *Atchley,* 53 Cal.2d 160, 170 [346 P.2d 764]; *People* v. *Trout,* 54 Cal.2d 576, 586 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Moranda,* 181 Cal.App.2d 600, 604 [5 Cal.Rptr. 522].)

 In the instant case, Inspectors Hall and Human testified as to various statements which defendant made to them upon their arrival at the cigar store. According to the testimony of Hall, defendant was asked if the check was his, "and he stated that it was ... and that it was a check for having worked out at the Ensign Cafe." Hall also testified that he asked defendant if his true name was Tommy Carpenter, and "he said it was." Human testified that he heard defendant say his name was Tommy Carpenter in response to Hall's question and that defendant also stated "he was just trying to cash the check" and "that the check he received for pay from the place that he worked." While these statements do not constitute a confession by defendant of the crime of forgery, they are strongly incriminating as admissions by defendant that he was attempting to pass himself off as Tommy Carpenter, the payee of the subject check. As such, these statements would be subject to exclusion under *Dorado* if they were made under circumstances encompassed within its holding.

Since the decision in *Dorado* the Supreme Court has had occasion, in *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], to further discuss the application of the *Dorado* rule. With respect to the requirement that an accused be advised of his right to counsel or to remain silent, *Stewart* holds that we cannot presume in the face of a silent record that the police informed the defendant of these rights. The Supreme Court also amplified upon the meaning of the first three elements of the *Dorado* rule, stating that the critical or accusatory stage is reached, entitling the suspect to counsel, when two conditions are met: (1) The officers have arrested

the suspect, and (2) the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements. In discussing the meaning of "arrest" *Stewart* states that an arrest includes "custody," and that an arrest fulfills the first requirement of *Dorado* that the investigation has begun to focus on a particular suspect. Stating that, "beyond the 'focus' and custody, the accusatory stage matures upon the undertaking by the police of a 'process of interrogations that lends itself to eliciting incriminating statements' " (p. 578), *Stewart* holds that the proper test, in ascertaining whether this third requirement of the *Dorado* rule is fulfilled, is an objective one turning upon an analysis of "the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." (P. 579.)

Adverting to the instant case, there is no question that at the time the subject statements were made the investigation had begun to focus on defendant. Although the record does not disclose whether defendant was under arrest when he made these statements, it is clear that he was, at the time, in custody. Relating to this point, defendant testified that "When the officers came, they grabbed me." Furthermore, even assuming that the police did not physically take defendant into custody immediately upon entering the cigar store, there is evidence in the record from which we can conclude that defendant's freedom of movement was curtailed once the police arrived at the store. We refer to the conversation between defendant and Hall, in which, in response to defendant's suggestion that the officers "step outside," the Inspector stated, " 'We're not stepping outside because you might run. . . .' "

We are satisfied, however, that although defendant was in custody and the investigation had begun to focus on him, the accusatory stage had not matured since the police had not undertaken "a process of interrogations that lends itself to eliciting incriminating statements." Applying the objective test announced in *Stewart* we are satisfied that the purpose of the interrogation was not to elicit a confession but to ascertain whether the check in question was defendant's and whether he was Tommy Carpenter, the payee named thereon. The questions asked were clearly of an investigatory nature and consistent with proper police work. The circumstances of the instant case are similar to those in *United States* v. *Konigsberg*, 336 F.2d 844. There the defendants were apprehended

in a garage containing stolen goods. They were arrested and brought to the office of the Federal Bureau of Investigation where the agents asked Konigsberg " 'why he was in this garage and just what had taken place ... and ... if he wished to cleanse himself or explain ... what his reasons for being there were, why the other individuals were there.' " (P. 852.) Among the reasons for not applying *Escobedo,* the court held that the purpose of such interrogation was not to elicit a confession but "to give Konigsberg a chance to explain his presence in the garage if he could" and to hear his "side of the story." (P. 853.) The court stated: "If Konigsberg or any of the other people caught in the garage could account for their presence this was their opportunity." (P. 853.) The rationale of *Konigsberg* was adopted by *Stewart* in formulating the test for determining whether the police have carried out "a 'process of interrogations that lends itself to eliciting incriminating statements.' " (P. 578.) Accordingly, in the light of the principles discussed we hold that in the instant case the subject interrogation did not amount to "a process of interrogations" the purpose of which was to elicit a confession.

The judgment is affirmed. The appeal from the order denying defendant's motion for new trial is dismissed.

Sullivan, P. J., and Sims, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 16, 1965.